FOURTH DIVISION
JUNE 8, 2006

No. 1-05-1338

| | | |
|---|---|---|
| STANLEY SPYRKA, as Independent Administrator | ) | Appeal from the |
| of the Estate of Dorota Spyrka, Deceased; | ) | Circuit Court of |
| and STANLEY SPYRKA, individually, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 01 L 1258 |
| v. | ) | |
| | ) | |
| THE COUNTY OF COOK and Dr. CHI DU, | ) | Honorable |
| | ) | James Varga, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE CAMPBELL delivered the opinion of the court:

Defendants County of Cook and Dr. Chi Du appeal a judgment of the circuit court of

Cook County finding them liable in a medical malpractice case brought by plaintiff Stanley

Spyrka, individually and as independent administrator of the estate of Dorota Spyrka. The trial

court entered the judgment on a jury verdict of $16,957,310. The trial court denied defendants'

posttrial motion. Defendants now appeal.

The record on appeal discloses the following facts. Dr. Robert J. Toltzis testified

regarding the medical records of the treatment of Dorota Spyrka at Cook County Hospital.

Dorota was admitted to the hospital on June 1, 2000, with difficulty in breathing, a fever and an

abnormal X ray. The saturation of oxygen in her blood was found to be reduced. Dorota was

given supplemental oxygen and antibiotics for several days. On June 6, 2000, Dorota had been

stable or improving over the previous two days when she screamed out that she could not

breathe. Her oxygen saturation, normally 98% or 99%, had fallen to 67%. Her heart rate had increased. Dr. Toltzis testified that "it's pretty well described that she had a pulmonary embolism at that point." According to Dr. Toltzis, a person having a pulmonary embolism will feel like they are suffocating and it will feel painful to breathe, causing anxiety and distress.

Dr. David M. Systrom, a pulmonary and critical care specialist, testified that a pulmonary embolism occurs when a blood clot that forms in the big veins of the legs, pelvis or abdomen (also known as a deep vein thrombosis or DVT) breaks loose and migrates north to the pulmonary arteries, where it can have a number of effects. As the pulmonary arteries carry blood to the lungs to be oxygenated, a blood clot large enough to block the main artery or its branches can cause low blood pressure, shock and death. Dr. Systrom demonstrated this testimony with a model.

Dr. Systrom explained that cases causing low blood pressure and shock are called massive pulmonary emboli. People can die from a massive pulmonary embolism that is either an acute or recurrent pulmonary embolism. An acute pulmonary embolism generally refers to the first such embolism; an estimated 10% of people die from an acute pulmonary embolism before it can be treated. According to Dr. Systrom, the vast majority of patients appropriately treated do well. Patients that are inappropriately treated may suffer from a recurrent pulmonary embolism, with a high mortality rate. Dr. Systrom explained that a second shower or second single clot can occlude enough of the blood flow to causing low blood pressure, shock and death.

Dorota was put on a ventilator in the intensive care unit (ICU). Cardiac echo testing suggested a pulmonary embolism.

Dorota was given TPA, which Dr. Toltzis testified was a thrombolytic agent that dissolves blood clots. Afterward, Dorota's oxygen saturation improved. Her heart rate was able to come down. On June 7, 2000, with oxygen supplementation, her saturation level returned to 98%. Dr. Systrom opined that this was a clear-cut, incontrovertible index of the patient's improvement. Dr. Systrom testified that this shows "[t]he blood clot is being dissolved actively by the TPA. It's shrinking in size. May or may not totally disappear but it's shrinking in size."

Dr. Systrom testified that the administration of TPA was completed at 9 p.m. on June 6, 2000. The team at Cook County Hospital began administering Heparin at about 2:30 a.m. on June 7, 2000.

Dr. William Haire, a physician and hematologist, testified that Heparin is an anticoagulant. Heparin slows blood clot formation and prevents the addition of material to preexisting clots. Dr. Haire testified that Heparin "doesn't really do anything for clots that are already there."

Dr. Systrom testified that there is a laboratory measure of the partial thromboplastin time called the APTT, or PTT for short, which indirectly measures the level of Heparin in the blood. Dr. Systrom testified that Cook County Hospital had a protocol stating that during the first 24 hours, the PTT test should be repeated every six hours, and once every morning thereafter, unless it is out of the therapeutic range. Dr. Systrom explained that the effects of Heparin vary in different patients, requiring frequent checks at first. Dr. Systrom testified that APTT levels should have been checked at 8 a.m., 2 p.m. and 8 p.m. on June 7, 2000, and 2 a.m. and 8 a.m on June 8, 2000, but were not. Dr. Systrom testified that PTT tests were done when the TPA was started and ended (both of which were appropriate), but the result for the second test was not in the therapeutic range. Dr. Systrom testified that as there was no PTT record for the period

Dorota was on Heparin, there was no way to be certain that she had enough Heparin to prevent a recurrent pulmonary embolism.

Dr. Haire testified that the records show that Heparin was discontinued at approximately 12 a..m. on June 8, 2000.

Dr. Gordon Fall, a family practice physician, testified that defendant Dr. Chi Du--then a first-year family practice intern--wrote the order to discontinue Heparin, prior to an angiogram that was supposedly going to be performed that day. Dr. Fall, having reviewed the deposition testimony of other doctors involved with Dorota's treatment, testified that Dr. Du would not have the authority to write an order discontinuing Heparin without first checking with a superior.

Dr. Du testified that she wrote the order discontinuing Heparin. Dr. Du testified that she was told by a member of the team that the attending physician had talked to the radiologist during the round and that the recommendation was to go forward with an angiogram. Dr. Du explained that Heparin would be held to prevent the risk of bleeding when the procedure was performed. Dr. Du stated that she would not make that decision. Dr. Du testified that a Dr. Gupta told her to discontinue Heparin at midnight because an angiogram was going to be done in the early morning.

The jury was read deposition testimony from other doctors involved with Dorota's case. Dr. Muthuswamy, retired former chair of the pulmonary division at Cook County Hospital, testified that he did not tell Dr. Du to stop the Heparin and that no one contacted him about it. Dr. Gupta, the ICU resident, did not think that he gave such an order because he was not present at the hospital; he had previously testified that he did not tell her to discontinue Heparin. Dr. Kenneth Cruz, who assisted the ICU residents and interns, did not recall Drs. Muthuswamy or

Gupta saying anything about discontinuing Heparin. Dr. Ramakrishna stated that he did not advise Dr. Du to discontinue Heparin and did not hear anyone else do so.

Dr. Arthur Waltman, a radiologist, testified that an angiogram to rule out a pulmonary embolism was not necessary. Dr. Waltman testified that a reasonable radiologist would not have ordered Heparin stopped without a procedure scheduled. Dr. Waltman testified that a reasonable amount of time for a patient to go without Heparin in anticipation of a procedure would be about two hours and that the anticoagulant effects of Heparin will continue for about 2 ½ hours after it is stopped. Dr. Systrom testified that Heparin has a half-life of 30 to 90 minutes and that, after three half-lives, most of the effect is gone.

Dr. Systrom testified that Dorota began to go into an arrest at around 11 a.m. on June 8, 2000. Dr. Waltman testified that the records show that around 11:20 a.m., Dorota developed severe bardycardia and hypertension. Dr. Toltzis testified that her heart rate dropped to the mid-30s and staff was unable to obtain a pulse. Dorota's respiration dropped to zero; the machine that had been supplementing her oxygen was required to breathe for her 100% of the time. Dr. Waltman testified that Dorota probably stopped experiencing the effects of a pulmonary embolism when she was declared dead approximately one-half hour later.

Plaintiff Stanley Spyrka testified that he and Dorota came to the United States in 1981 and were married in 1986. The two had a daughter, Pam. Stanley was visiting his wife on the morning of June 8, 2000. Stanley testified that she initially looked good, but later began to breathe heavily and started coughing and foaming at the mouth and nose. Stanley sent Pam for help. A nurse arrived about five minutes later, looked and left. Dorota was trying to breathe and was gagging the whole time; he could tell she was suffering. About 15 minutes later, "everything got hooked on" and he thought her heart alarm started beeping. Stanley testified that

four doctors came in; he thought they were trying to massage her heart. Later, more team people came and Stanley was asked to wait in the hallway. Stanley testified that in an hour or so, he was called into the room and told Dorota had died. Dr. Haire testified that the time of death was 12:36 p.m.

Dr. Toltzis opined that Dr. Du deviated from the standard of care in discontinuing Heparin. Dr. Toltzis attempted to opine that the discontinuation of Heparin allowed another blood clot to form in the extremities and break off, but the trial court sustained defendants' objection that the opinion was not disclosed under Supreme Court Rule 213 (188 Ill. 2d R. 213). Dr. Toltzis stated that Dorota died of a subsequent pulmonary embolism and that Heparin reduces the risk of a fatal pulmonary embolism.

Dr. Fall opined that Dr. Du deviated from the standard of care in discontinuing Heparin. After the trial court sustained a Rule 213 objection to an opinion about the clot developing, breaking off and going up to the lungs, Dr. Fall opined that Dorota died of a recurrent thrombus that probably developed in the left leg.

Dr. Systrom opined that Dr. Du deviated from the standard of care in a major way by discontinuing Heparin. He also opined that the angiogram was unnecessary. Dr. Systrom opined that discontinuing Heparin caused or contributed to Dorota's death because she:

> "was left unprotected with no anticoagulation on board for a 12-
> hour period after having suffered a massive pulmonary embolism.
> So the patient had no mechanism for controlling the residual clot
> that was either in the legs or elsewhere and the patient *** had at
> least a 10- to a 15-fold increase[d] risk for recurrent pulmonary
> embolism in the absence of any therapy for 12 hours."

Dr. Waltman opined that Dr. Du deviated from the standard of care in discontinuing Heparin. Dr. Waltman opined that stopping Heparin "precipitated or at least left her exposed and at risk and then subsequently she developed further deterioration and probably another embolus."

Dr. Haire opined that Dr. Du deviated from the standard of care in discontinuing Heparin. Dr. Haire also testified that a video animation would help him explain to the jury what a DVT is, what a pulmonary embolism is and how TPA and Heparin prevent death.

The record shows that this video animation was the subject of motions in limine. On August 27, 2004--the same day as the opening statements in this trial--plaintiff informed defendants and the court that he intended to show an "animation of a PE being formed and a DVT going up through the heart" that had not been previously disclosed and would not be completed until August 30, 2004. Plaintiff's counsel also objected when defense counsel suggested that the animation should be shown to the defense experts, on the ground that such a review would violate Rule 213. Plaintiff's counsel noted there was a sequestration order and would object to the defense experts seeing new information. The issue was not resolved prior to opening statements.

On August 30, 2004, defendants presented a motion in limine to bar the animation, which had yet to be produced. Plaintiff's counsel then showed the animation to opposing counsel and the trial judge. The defense then objected, arguing that the animation misrepresented certain issues, it was irrelevant, it had not been timely produced to the defense and was substantially more prejudicial than probative. The trial court decided to bar use of the video animation.

On September 1, 2004, plaintiff presented a motion to admit the video animation. Following argument on the matter, the trial court granted plaintiff's motion, stating in part:

"But it seems to me that there is a factual basis for these. My listening, that there is a factual basis for it. Okay? I know the defense contests them. And so often in medicine, you know, we don't know exactly what happened at this minute. Well, that's medicine. I mean, you know, it's not like mathematics where they have absolute certainty. I understand it's more probably true than not. So I think cross-examination can get into it [if] there's a problem with whatever is in the animation. You can cross on it. So I think the animation comes in."

Defendants then moved for a mistrial, which the trial court denied. Later that day, defendants renewed their objection to the video animation, noting that the defense had seen it only once and had not sought to have it reviewed for accuracy or authenticity after it was barred by the trial court's initial ruling. In the alternative, defendants requested that the animation be altered or redacted to omit certain substantive words, dates and times shown in the animation. The trial court denied the motion. Defendants renewed their motion for a mistrial, which the trial court denied with the comment, "Fine. Take me up. You know." Plaintiff also refused to tender a copy of the animation, because there was only the original, which cost over $20,000.

Dr. Haire testified using the video animation later that day. The trial court told the jury that the video was a demonstrative aid, not evidence. Dr. Haire then gave testimony while proceeding through the video animation. Dr. Haire opined that, presuming that Heparin was given at the correct dosage to prevent new clot formation, within a couple of hours after it was stopped, the effect on blood clot formation had basically gone away, so that the blood began to clot again at around 2 a.m. He also opined that "[i]t was the cessation of [H]eparin therapy that,

with a reasonable degree of medical certainty, allowed the clots to form that ultimately killed her."

On cross-examination, Dr. Haire testified that he had nothing to do with the creation of the video animation. Dr. Haire admitted that he did not know whether any physician helped create the video animation. Dr. Haire testified that the animation "generically" supported his opinions. Dr. Haire testified that he was not saying that the video represented what actually happened to Dorota, because he could not say what actually happened to her. Dr. Haire admitted he did not know when the clot existed in her lung and did not know how much clot was in her lung prior to the fatal embolism.

Dr. John Burke, an economist, testified that the present cash value of the loss of Dorota's income from her death at age 41 through age 66, which was estimated to be $417,792. Dr. Burke also testified that the loss of Dorota's household services was estimated to be $907,535, had she lived until the year 2033. Plaintiff's counsel then read figures from life expectancy tables prepared by the United States Department of Health and Human Services, National Center for Health Statistics, Centers for Disease Control and Prevention, and the National Vital Statistics System. Stating that plaintiff was a white male between 49 and 50 years old, plaintiff's counsel stated that the tables showed he could be expected to live another 29.3 years. As to the daughter Pam, as a white female between 16 and 17 years old, the tables showed she could be expected to live an additional 64.8 years. As to Dorota, as a white female between the age of 40 and 41, the tables showed she would have been expected to live another 41.6 years.

Dr. Oswaldo Rubenstein, the attending pathologist at Cook County Hospital, testified regarding the autopsy he performed on Dorota on June 8, 2000. Dr. Rubenstein testified that the cause of death was a compromise of the general pulmonary circulation as a result of multiple

occlusions of the pulmonary vessels by emboli. Dr. Rubenstein testified that some of the emboli showed evidence of "early organization," which refers to cells from the tissue surrounding a stuck clot trying to dissolve the clot. He explained that the types of cells found in the clot thus allow a fairly accurate determination of the age of the clot.

Dr. Rubenstein testified that some of the clots had been present for between 48 and 72 hours before death. Dr. Rubenstein testified that these clots caused the infarct (or tissue death), but that Dorota did not die from the infarct. The more recent clots that did not cause an infarct, but nevertheless blocked the circulation, were 12 or 15 hours old.

Dr. Eric Gluck, a pulmonary and critical care physician, testified that Dorota died from a combination of factors. She had not fully recovered from pneumonia and had a massive pulmonary embolism on June 6, 2000, with a subsequent failure on the right side of the heart, not the left which doctors typically worry about. Dr. Gluck testified that stopping the Heparin was not in the patient's best interest. Dr. Gluck also testified that the events causing Dorota's death predated the withdrawal of Heparin. Dr. Gluck opined that if the Heparin had been continued until the time of the pulmonary angiogram, Dorota's outcome would have been no different.

Dr. Gluck opined that it was unlikely that Dorota died from a recurrent pulmonary embolism for two reasons. First, a Doppler ultrasound study was conducted on Dorota's lower extremities after the initial pulmonary embolism which showed no clot in her leg and no source apparent to anybody for a clot. Second, the autopsy showed no fresh clot. Dr. Gluck testified that after Heparin is therapeutic, it takes about three hours to wear off. Then a new clot would have to form and make its way to the lung. Thus, the clot would have to be less than 12 hours old. Dr. Gluck testified that you do not count the time up through the time the autopsy is performed, but admitted he does not do autopsies.

Dr. Robert Vogelzang, who is board certified in radiology and vascular and interventional radiology, testified that the cessation of Heparin for 11 hours before planning a pulmonary angiogram was "longish," but not a deviation from the standard of care. Like Dr. Gluck, Dr. Vogelzang opined that, based on the age of the clots revealed in the autopsy, he did not believe that a clot formed, propagated and traveled to the lungs during the period after the Heparin would have worn off after it was discontinued.

Following closing arguments and jury instructions, the jury deliberated and returned a verdict for the plaintiff and against defendants in the amount of $16,957,310, itemized as follows: $2.2 million for Dorota's pain and suffering; $500,000 for Dorota's lost earnings; $44,000 for Stanley's loss of money, benefits, goods and services; $350,000 for Stanley's likely future loss of money, benefits, goods and services; $44,000 for Pamela's loss of money, benefits, goods and services; $440,000 for Pamela's likely future loss of money, benefits, goods and services; $689,655 for Stanley's loss of society and sexual relations; $5 million for Stanley's likely future loss of society and sexual relations; $689,655 for Pamela's loss of society; and $7 million for Pamela's likely future loss of society. The defendants filed a posttrial motion, which the trial court denied on March 23, 2005. Defendants filed their notice of appeal on April 21, 2005.

I

Defendants initially argue that the trial court erred in admitting the video animation used in Dr. Haire's testimony. Plaintiff initially responds that defendants waived the issue by failing to object when the video was used. Generally, the denial of a motion in limine does not preserve an objection to disputed evidence that is introduced later at trial; a contemporaneous objection to the evidence at the time it is offered is typically required. See Simmons v. Garces, 198 Ill. 2d

541, 569 (2002). This is because a ruling on a motion in limine is interlocutory and subject to reconsideration. Schuler v. Mid-Central Cardiology, 313 Ill. App. 3d 326, 334 (2000). On the other hand, to save a question for review, an objection need not be repeated each time similar matters are presented where the court has previously ruled. Nave v. Rainbo Tire Service, Inc., 123 Ill. App. 3d 585, 589-90 (1984), citing Chicago Union Traction Co. v. Lauth, 216 Ill. 176, 180 (1905). Once the court has ruled, a party is entitled to assume that the trial judge will continue to make the same ruling and that he need not repeat the objection. Nave, 123 Ill. App. 3d at 590. The question of whether the trial court's ruling is sufficiently definitive depends on the procedural posture of each case. Once the full context of the evidentiary issue develops at trial, such that a motion thereon no longer presents the risk of an erroneous ruling that a pretrial motion in limine presents, any ruling on the merits is not interlocutory, and the unsuccessful movant need not object further to preserve the issue for review. McMath v. Katholi, 304 Ill. App. 3d 369, 376-77 (1999), rev'd on other grounds, 191 Ill. 2d 251, 730 N.E.2d 1 (2000).

In this case, plaintiff's counsel did not inform defendants of his intent to use a video animation until the day of opening statements and was unable to show the animation to defense counsel or the trial judge until three days later. The trial court initially granted defendants' motion to bar the animation, but reconsidered and reversed near the end of the plaintiff's case, after several of plaintiff's experts had testified. The trial court so ruled on the same day that Dr. Haire used the exhibit, after the trial court denied reconsideration of the ruling and alternate relief and denied two defense motions for a mistrial. The trial court concluded by telling defense counsel, "Fine. Take me up. You know," which appears to invite counsel to take the issue up on appeal. Given this record, defendants were entitled to conclude that the trial judge would continue to make the same ruling and were not required to repeat the objection.

Turning to the merits, we first address the timeliness of the disclosure of the animation. Our discovery rules have the dual purposes of avoiding surprise and discouraging tactical gamesmanship. See Sullivan v. Edward Hospital, 209 Ill. 2d 100, 109-10 (2004). Defendants argue the timing was not a problem, citing *Velarde v. Illinois Central R.R. Co., 354 Ill. App. 3d 523, 532 2004*, which held that a new trial was not required by the disclosure of the plaintiffs' "day in the life video" on the first day of trial:

> "Defendants' additional contention that the video should have been barred outright because the [plaintiffs] delayed in creating it and did not disclose it at least 60 days before trial pursuant to Supreme Court Rule 218©) (166 Ill. 2d R. 218©)) is unpersuasive, given that the record suggests the court modified the discovery deadline. Defendants do not deny the [plaintiffs'] assertion that depositions were being taken by both sides until a week before trial. Moreover, since the purpose of the video was to illustrate the evidence regarding Lilia's life at the time of trial, it would make little sense to record her activities months in advance." Velarde, 354 Ill. App. 3d at 532.

In this case, plaintiff points to no order extending the discovery deadlines. Plaintiff admitted at oral argument that Dr. Haire's deposition was taken months prior to trial. The animation purports to show what happened to Dorota years prior to the trial. The reasons for excusing late disclosure given in Vellarde are not present in this case.[1]

---

[1] We also note in passing that plaintiff's counsel listed nine potential expert witnesses for

Turning from procedure to substance, the video animation was admitted on the ground that it was demonstrative evidence. The admission of a videotape or similar exhibit as demonstrative evidence is within the sound discretion of the circuit court and will not be

---

trial, but declined to inform opposing counsel which experts might be called on a given day at trial. The trial court had previously declined to rule on defense motions in limine seeking to bar some of the expert testimony as cumulative. At trial, plaintiff's counsel withdrew three of the experts in response to defense objections. Although defendants do not claim that the trial court erred in denying the defense motions to bar, we note the record shows a lack of cooperation between counsel and the type of gamesmanship the discovery rules attempt to discourage.

disturbed absent an abuse of discretion. People ex rel. Sherman v. Cryns, 203 Ill. 2d 264, 284 (2003). An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. People v. Illgen, 145 Ill. 2d 353, 364 (1991). An application of impermissible legal criteria also justifies reversal. Boatmen's National Bank of Belleville v. Martin, 155 Ill. 2d 305, 314 (1993).

Demonstrative evidence has no probative value in itself. It serves, rather, as a visual aid to the jury in comprehending the verbal testimony of a witness. Cisarik v. Palos Community Hospital, 144 Ill. 2d 339, 341 (1991). Before a film can become evidence at trial: (1) a foundation must be laid, by someone having personal knowledge of the filmed subject, that the film is an accurate portrayal of what it purports to show; and (2) the film's probative value cannot be substantially outweighed by the danger of unfair prejudice. See Cisarik, 144 Ill. 2d at 342.

In Dillon v. Evanston Hospital, 199 Ill. 2d 483, 493-94 (2002), our supreme court held that the trial court did not abuse its discretion by admitting a videotape as demonstrative evidence. In Dillon, the plaintiff's expert physician testified that the video animation would be helpful in explaining to the jury the general development of endocarditis, a condition for which plaintiff was placed at risk. The plaintiff's expert clearly and specifically explained the relevant differences between the type and location of infection depicted in the videotape and the infection that plaintiff could suffer in the future. Further, defendants had the right and the opportunity to cross-examine so as to assure that the videotape could not have misled or confused the jury.

In Glassman v. St. Joseph Hospital, 259 Ill. App. 3d 730, 754-56 (1994), this court upheld the trial court's decision to admit a videotape of other surgeons performing a triple bypass surgery similar to the surgery at issue in the case. The court admonished the jury that the tape

was only a demonstrative aid, and the defendant told them that he was not the surgeon shown on the tape, so the jurors were not misled.  The Glassman court distinguished Glusaskas v. Hutchinson, 148 A.D.2d 203, 544 N.Y.S.2d 323 (1989), which disapproved as self-serving a defendant surgeon's videotape of the defendant performing the same type of surgery properly. Glassman, 259 Ill. App. 3d at 755.

In contrast, our supreme court reversed a judgment where a movie preconditioned the minds of the jurors to accept the plaintiff's theory, because the film depicted what she claimed occurred the night of the accident, but not facts adduced at trial.  French v. City of Springfield, 65 Ill. 2d 74, 81-82 (1976).  Similarly, our supreme court affirmed the exclusion of photographic evidence taken for the purpose of supporting one party's theory and not to show the physical facts as they actually existed at the time of the crime.  People v. Crowe, 390 Ill. 294, 303-04 (1945).

In this case, the video animation is not a general demonstrative exhibit intended to help the jury understand the general mechanism of a pulmonary embolism.  Nor is it intended to explain the general effects of TPA or Heparin.  Rather, the animation in this case purports to show, in a step-by-step fashion, what happened to Dorota in this case, which makes it unlike the movies admitted in Dillon and Glassman.  The animation here depicts the plaintiff's theory of causation.  The animation makes no attempt to account for the expert testimony of Drs. Rubenstein and Gluck, that the clots found in the autopsy did not form during the period after Heparin was stopped.  There is no evidence that the fresh clot formed during that period in Dorota's leg as shown in the video, though there was evidence that clots had formed there in the past.

On cross-examination, Dr. Haire admitted that he was not saying that the video represented what actually happened to Dorota, but the jury had already seen the prejudicial video at that point. In such cases, the ameliorative steps taken by the trial court will not always be sufficient to remedy the prejudice to the opposing party. See Clayton v. County of Cook, 346 Ill. App. 3d 367, 380 (2003). It seems highly likely that the jury could be misled by Dr. Haire's narration of a video that purports to show what happened to Dorota, only to have him admit that he could not actually say that what was shown in the video actually happened.

Plaintiff's brief quotes at length from Dr. Haire's deposition testimony to support the content of the video animation. The quoted excerpts show that Dr. Haire testified that it was "more likely than not that the recurrent embolization which caused her death was due to inadequate amounts of Heparin." Generally, to the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery. Snelson v. Kamm, 204 Ill. 2d 1, 28 (2003). However, this case was not tried on a lost chance theory. Dr. Haire's reference to inadequate amounts of Heparin may refer to the stoppage after midnight, but it may also encompass the uncertainty over whether Dorota was ever given a therapeutic dosage of Heparin.

In sum, the video animation was not timely disclosed. Nor was it a general demonstrative aid. The animation would tend to precondition the minds of the jurors to accept the plaintiff's theory. It ignores evidence contrary to that theory. It presents as fact at least one aspect for which plaintiffs have identified no support in the record. Dr. Haire could not state that the animation was an accurate portrayal of what it purports to show. The transcript shows that the trial judge was aware that the facts the video purported to show were disputed, yet reversed

his prior ruling to admit it. This was not only arbitrary, but also legally incorrect. Thus, we conclude that a new trial is required in this case. Given this conclusion, we need not address defendants' claim that *the jury's verdict was against the manifest weight of the evidence.*

## II

Defendants also claim that the trial court should have ordered a new trial based on improper opening and closing arguments made by plaintiff's counsel. We address these claims so that potential problems may be avoided in any new trial.

Defendants first point to plaintiff's counsel's opening statement, in which, after summarizing the evidence he expected to present, stated "Having said all of this, what's the most disturbing part of this case? The evidence will show, ladies and gentlemen, nothing has changed at Cook County Hospital." The trial court sustained the objection to that statement and several sentences that followed. The transcript shows that during a recess, the trial court asked defense counsel about the statement and indicated that he should not be raising the issue of subsequent remedial measures. Generally, evidence of postaccident remedial measures is not admissible to prove prior negligence. Schaffner v. Chicago & North Western Transportation Co., 129 Ill. 2d 1, 14 (1989). Plaintiff's counsel cites no case law suggesting the argument was proper. The trial court sustained defendants' objections, which generally cures any prejudice that may be suffered from the improper argument. Clayton, 346 Ill. App. 3d at 383.

However, we note that plaintiff's closing argument stated that the jury's job is:

> "A precious job, and in this case you have been asked to do
> something very hard, to tell two parties whether or not medical
> care was acceptable. Same type we either receive or may receive
> in the future. Any or all of us. ** It is your voice today that will

enable you to cherish, to protect that medical system.  To use your

voices to say, is the type of treatment Mrs. Spyrka got at Cook

County Hospital, was that treatment reasonable or was it

unreasonable?  Is the type of treatment that Cook County should

give to patients like Mrs. Spyrka in the future?"

Plaintiff's counsel made another reference to future medical care during rebuttal argument.

Plaintiff correctly notes that defendants did not object to such argument at trial, which generally results in waiver.  Defendants ask this court to invoke the plain error doctrine.  Generally, a  court of review should "strictly apply the waiver doctrine unless the prejudicial error involves flagrant misconduct or behavior so inflammatory that the jury verdict is a product of biased passion, rather than an impartial consideration of the evidence."  Gillespie v. Chrysler Motors Corp., 135 Ill. 2d 363, 375-76 (1990).  If arguments were so egregious that they deprived a litigant of a fair trial and substantially impaired the integrity of the judicial process itself, they may be reviewed even though no objection was made.  Gillespie, 135 Ill. 2d at 375-77.  This standard has been applied in cases involving "blatant mischaracterizations of fact, character assassination, or base appeals to emotion and prejudice."  Gillespie, 135 Ill. 2d at 377.

In this case, the argument appeals to emotion, rather than the evidence in the case before the jury.  In Department of Conservation v. Strassheim, 92 Ill. App. 3d 689, 695 (1981), this court did not find an argument urging the jury to "send out a message" to the Department of Conservation that the community would not tolerate a kind of behavior to be so egregious that it deprived defendants of a fair trial.  However, in Zoerner v. Iwan, 250 Ill. App. 3d 576, 584-86 (1993), this court ruled that it was plain error for the closing argument to urge the jury to make a general social statement about drunken driving.  The opening statement and closing argument,

taken together, could have suggested to the jury that Cook County Hospital should be judged based on past reputation and that they should "send a message" by appealing to the jury's sense of moral outrage. Such arguments should be avoided at any new trial in this matter.

Finally, defendants point to the closing argument that the jury should award damages "as to the loss of society Pam is likely to suffer in the future, for the next 65 years of Pam's life." Plaintiff again notes that defendants did not object to the argument at the time. Nevertheless, defendants cite *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 203 1996, which addressed Illinois Pattern Jury Instructions, Civil, No. 31.13 (3rd ed. 1989), which read, in part: "'If you find for the plaintiff, then in assessing damages you may consider how long [each of the beneficiaries] will be likely to sustain pecuniary losses as a result of James Kevin Barry's death, considering how long James Kevin Barry was likely to have lived and how long [each of the beneficiaries is] likely to live.'"

In analyzing the issue, this court stated that, "[a]s a matter of logic, if not law, the life expectancy of a survivor should come into play only if it is expected to be shorter than the life expectancy of the deceased," but ultimately found no prejudice in that case because: the instruction was permissive; '[t]here was no reason to believe the jury was misled or confused by it"; the "plaintiff did not tell the jury it should award money for years beyond Barry's life expectancy"; and "defendant was free to *** argue to the jury that the relevant time period was the life expectancy of the decedent, not the survivors." Barry, 282 Ill. App. 3d at 203-04.

In this case, the itemized verdict shows the jury awarded a far greater sum for Pam's likely future loss of society than Stanley's likely future loss of society and sexual relations. Indeed, Pam's likely future loss of society was the single largest item of the verdict. In any new trial, the trial court should ensure that the jury is instructed that the life expectancy of a survivor should come into play only if it is expected to be shorter than the life expectancy of the deceased. Similarly, counsel should avoid any argument to the contrary.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is reversed and the case is remanded for a new trial.

Reversed and remanded.

QUINN, P.J., and GREIMAN, J., concur.