Sharon Roy, Plaintiff-Appellant,†

v.

St. Lukes Medical Center, Defendant,

Medical Protective Company, Shekhar Sane, M.D., Milwaukee Radiologists, Ltd., and Wisconsin Patients Compensation Fund, Defendants-Respondents.

Court of Appeals

*No. 2006AP480. Submitted on briefs June 5, 2007. —Decided September 5, 2007.*

2007 WI App 218

(Also reported in 741 N.W.2d 256.)

† Petition to review denied 1/22/08.

658

660

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *David G. Pribyl* of *Salvi, Schostock & Pritchard, P.C.*, of Waukegan, Illinois.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Paul R. Erickson* and *Bradley S. Foley* of *Gutglass, Erickson, Bonville & Larson, S.C.*, of Milwaukee.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J.   Sharon Roy appeals from an order for judgment entered after a jury found that Shekhar Sane, M.D., an interventional radiologist, was not negligent during an angiogram procedure that he performed on her. The issue on appeal is whether the trial court erred in allowing Dr. Sane, his employer, Milwaukee Radiologists, Ltd., and their insurer, the Medical Protective Company (collectively referred to as Dr. Sane), to play two video animations for the jury, which purported to depict both parties' theories of the events that transpired during the angiogram procedure. Roy contends that the trial court should have excluded the animations for the following reasons: they subjected her to unfair surprise and unduly prejudiced her case; they were improperly proffered by Dr. Sane as demonstrative evidence; there was a lack of foundation; and the animations were an inaccurate

portrayal of actual events. Because we conclude that the trial court properly exercised its discretion in allowing the animations into evidence, we affirm.

## I. Background.

¶ 2. This appeal arises out of a medical malpractice lawsuit filed by Roy against Dr. Sane related to an injury Roy sustained during an angiogram procedure performed by Dr. Sane on January 10, 2002. During the procedure, Dr. Sane dislodged a previously deployed stent located in Roy's right iliac artery. As a result, Roy contends that there was a disruption of plaque in her subclavian artery, which embolized to the brain, causing her to suffer a midbrain stroke resulting in severe brain injury leading to permanent cognitive and physical deficits.

¶ 3. Whether Dr. Sane was negligent in deviating from the standard of care hinged upon the tactile feedback that he experienced while performing the angiogram procedure. Trial testimony reflected that the extent of tactile feedback relates to the degree of endothelialization (i.e., whether the previously deployed stent had grown into the vessel wall of Roy's common iliac artery) that had occurred with respect to a previously deployed stent at the time Dr. Sane performed the angiogram.

¶ 4. Thus, a critical issue at trial was the extent that the previously deployed stent had endothelialized, which would shed light on whether Dr. Sane should have felt additional resistance while advancing the guardwires, sheaths and catheters that the angiogram procedure entailed. If the previously deployed stent had fully endothelialized, it was undisputed that Dr. Sane should have sensed tactile feedback.

¶ 5.    On the fifth day of the eight-day jury trial, Roy's attorneys were first made aware that Dr. Sane intended to utilize animations depicting the parties' theories on how the stent was dislodged. Dr. Sane's attorneys sought to introduce the animations during their liability expert's, Robert Vogelzang, M.D., testimony. Roy's attorney objected based on timeliness due to the fact that the animations were never previously produced and because Roy's expert, David Hovsepian, M.D., who had already testified, never had an opportunity to review them. In responding to the objection, Dr. Sane's attorney described the animation as follows:

> [Dr. Sane's attorney:] I think the whole thing is 20 seconds. There's two clips, the plaintiff's version, defense version. It depicts the iliac stent in place with the sheath and dilator traveling up in one instance. My expert's theory of this case is that if excessive force was required to pull this thing free, the blood vessel in the iliac artery which is not present at the postprocedure angiogram [would have ruptured].

> THE COURT:    Is this taken from angiogram photos or is this an illustrative –

> [Dr. Sane's attorney:] It's an illustrative thing.

> . . . .

> [Dr. Sane's attorney:] It actually – it actually is an animation. I think about 10 seconds on the defense version, 10 seconds on the plaintiff's version and that's it. It shows – as I said, it shows the sheath coming up snaring the stent. In one instance it slides smoothly and easily the other shows vessel damage. And I should say that if timeliness – I'm not aware of an order that we do this sooner. But I don't remember seeing this one before.

> [Roy's attorney:] That's true. We didn't.

. . . .

THE COURT: Anything else you want to say on the objection?

[Roy's attorney:] Well, it goes to the crux of the issue. Doctor Vogelzang testified in his discovery deposition that he has never ever dislodged the stent. So, therefore, he would never know what force would need to be required in order to dislodge that stent or how that stent would move as it pertains to the advancement of the sheath through the cells of the stent.

. . . .

[Roy's attorney:] As I said, I asked [Doctor Vogelzang] in the discovery deposition whether he had ever experienced this and he said no, he had not. So with respect to foundation, there would be no foundation as to, you know, how the – and he also said that it's really unknowable as to how this stent became deformed. So I would say that the video is based upon his speculation. Because he's never done it[, it] lacks foundation. And this goes to the crux of the matter as to whether or not there was any additional force or not. And I think it would be prejudicial for those reasons as well as for the reason that I wasn't able to have Doctor Hovsepian shown it as well.

¶ 6. The trial court overruled Roy's objections to the animations, acknowledging, "[i]t certainly would have been better if this could have been provided earlier, but it's closer to just having a witness draw something in court or come in with a diagram to help illustrate testimony. And in that sense, I'm going to allow it."

¶ 7. The video animation portraying the plaintiff's theory of the case showed the stent as being fully endothelialized, while in the defendant's version there is

no endothelialization. Roy argues that both animations fail to accurately depict the theories of Dr. Hovsepian and Dr. Vogelzang.

¶ 8.  At trial, Dr. Vogelzang testified:

> My opinion is that this stent was not fully integrated, was perhaps partially endotheli[a]lized with islands or bits of endothelia which were probably covering it but not sufficiently done or present that this stent was fixed in place and, therefore, it was easily pulled, distracted perhaps, pulled a little in its length but pulled out of the iliac artery in a very smooth fashion without underlying damage to the artery.

Notwithstanding his opinion that the stent was "perhaps partially endotheli[a]lized," he acknowledged during cross-examination that in the defense version portrayed in the animation, no endothelialization was depicted.

> [Roy's attorney:] This is the version of what you think happened; is that right?
>
> [Dr. Vogelzang:] It's our best approximation given the limitation of animation. It, of course, is not a look inside Mrs. Roy's body. But, yes. It's a schematic or divermatic representation of the action of this catheter sheath.
>
> . . . .
>
> [Roy's attorney:] And as we have found out in this case by your testimony here today, whether or not that stent was well-endotheli[a]lized is vital to your opinions in this case?
>
> [Dr. Vogelzang:] Yes. Endotheli[ali]zation of a stent is an important part of this.

[Roy's attorney:] Now, on this drawing which was produced by the defense, there is no endotheli[ali]zation depicted, is there?

[Dr. Vogelzang:] That's correct.

[Roy's attorney:] And that's not the way it was. You yourself even said that the endotheli[ali]zation was patchy, right?

[Dr. Vogelzang:] Yes, I did.

. . . .

[Roy's attorney:] As you stated, you don't know precisely how this [stent] was dislodged, fair?

[Dr. Vogelzang:] No, we don't. We don't have the kind of information that would tell us that.

. . . .

[Roy's attorney:] One of the reasons that we don't know or you don't know where this [stent] became deformed and when is because there weren't any images shot from the time it was dislodged until the time it was discovered, fair?

[Dr. Vogelzang:] Yes . . . .

¶ 9.　Roy further contends that the animation does not represent her version of the events that transpired. To explain what the video animation of the plaintiff's theory depicted, Dr. Vogelzang stated:

What you're seeing here is the stents in place and this sheath being passed through the stent and pulling it, tearing it out, leading irregularity of the wall and the very distinct *possibility* that bleeding or tearing could occur. This is representing bleeding. So what we're depicting here is an animation which would represent

the type of damage that could well – or *I would expect may well occur* if the kind of excessive force was applied to a stent that was fully integrated.

(Emphasis added.) Roy argues that the animation of her theory depicted a stent that was 100% endothelialized, contrary to Dr. Hovsepian's testimony that approximately 20% of the stent had not endothelialized. She also contends that she never argued that blood "gushed" out of her artery when Dr. Sane dislodged the iliac stent and that "there is no proof to support a contention that this [bleeding] would in fact be the result of a fully endothelialized stent being snagged and dislodged."

¶ 10. Despite Roy's objection to the use of the animations, the trial proceeded and the jury found that Dr. Sane was not negligent. Roy filed a motion for a new trial and a motion for judgment notwithstanding the verdict. The trial court denied Roy's motions.[1] Roy now appeals.

---

[1] A hearing was held on Roy's motions after verdict. Roy included the transcript from the hearing in the appendix to her brief; however, it was not made part of the appellate record. We are limited to matters in the record, *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992), and will not consider any materials in an appendix that are not in the record, *State v. Smith*, 100 Wis. 2d 317, 322, 302 N.W.2d 54 (Ct. App. 1981), *overruled on other grounds by State v. Firkus*, 119 Wis. 2d 154, 350 N.W.2d 82 (1984). Consequently, we have disregarded that portion of the appendix because it .is not a part of the record before us. The absence of a transcript in the record compels us to accept the findings of the trial court. *Austin v. Ford Motor Co.*, 86 Wis. 2d 628, 637–38, 641, 273 N.W.2d 233 (1979) ("[T]he court will assume, in the absence of a transcript, that every fact essential to sustain the trial judge's exercise of discretion is supported by the record.").

## II. Analysis.

¶ 11.   "We review a court's evidentiary rulings for an erroneous exercise of discretion." *Pierce v. American Family Mut. Ins. Co.*, 2007 WI App 152, ¶ 5, 303 Wis. 2d 726, 736 N.W.2d 247.[2] Specifically, the determination as to whether to allow demonstrative evidence to be presented to the jury rests primarily with the trial court. *See Hernke v. Northern Ins. Co.*, 20 Wis. 2d 352, 359, 122 N.W.2d 395 (1963). In light of our deferential review, we will affirm so long as "the trial court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). Given that the exercise of discretion is fundamental to the trial court's ability to fulfill its role in the legal system, "we will search the record for reasons to

In addition, in portions of her brief, Roy's citations to the record do not comport with the entries in the record index or are missing entirely, in violation of WIS. STAT. RULE 809.19(1)(e) (2005–06). In other instances, the citation that she does provide is inadequate because it refers only to her appendix, which fails to contain any record citation whatsoever. We have no duty to scour the record to review arguments unaccompanied by adequate record citation. *See Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990).

[2] Roy does not provide the standard of review in her appellate briefs. Yet, in her docketing statement, she indicates that the appropriate standard of review is *de novo* without providing any citations. The docketing statement required that Roy specify the proper standard of review for each issue to be raised and cite relevant authority. Roy's contention that she is entitled to our independent review of the trial court's decision to allow the animations into evidence is unsupported.

sustain its exercise of discretion." *Olivarez v. Unitrin Prop. & Cas. Ins. Co.*, 2006 WI App 189, ¶ 17, 296 Wis. 2d 337, 723 N.W.2d 131.

*A. There was no unfair surprise or undue prejudice.*

¶ 12. Roy argues that the video animations should have been excluded on the grounds of unfair surprise.[3] To support her argument, she relies on WIS. STAT. § 904.03 (2003–04), which allows for the exclusion of otherwise relevant evidence, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[4] We acknowledge that while "surprise" is not included in § 904.03 as a basis on which to exclude otherwise relevant evidence, "testimony which results in surprise may be excluded if the surprise would require a continuance causing undue delay or if surprise is coupled with the danger of prejudice and confusion of issues." *Gieseke v. DOT*, 145 Wis. 2d 206, 213, 426 N.W.2d 79 (Ct. App. 1988) (citation and quotations omitted). Roy does not argue that the surprise here would have caused undue delay, and we are not convinced that either the danger of prejudice or confusion of issues was

[3] Roy repeatedly cites to an unpublished decision as support for her argument, and in so doing, blatantly fails to conform to the rules of this court by citing an unpublished opinion in violation of WIS. STAT. § 809.23(3) (2005–06). Counsel is admonished that citation of unpublished opinions may be subject to sanction. *Tamminen v. Aetna Cas. & Sur. Co.*, 109 Wis. 2d 536, 563–64, 327 N.W.2d 55 (1982).

[4] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

669

such that the trial court erroneously exercised its discretion in allowing the animations into evidence.

¶ 13.   Roy contends that if she had "been fully and fairly advised" of Dr. Sane's intent to introduce the animations, she could have requested a continuance in order to review the video with Dr. Hovsepian to ensure its accuracy and reliability and to provide her attorneys with time to prepare their cross-examination of Dr. Vogelzang relative to the animation. In addition, she contends that she was denied the opportunity to present a motion *in limine* to minimize the purported prejudicial effect of showing the animations to the jury.[5]

¶ 14.   There is nothing in the record that indicates Roy requested a continuance when she was first made aware of the animations on the fifth day of trial. Furthermore, she cites to nothing in the record reflecting that she was *denied* the opportunity to present a motion *in limine;* indeed, there has been no showing that such a motion was ever requested. Moreover, there is no indication in the record that Roy's counsel requested that her expert, Dr. Hovsepian, be allowed to testify in rebuttal. Even on appeal, Roy offers no information as to how Dr. Hovsepian's testimony would have changed had he viewed the animations. Accordingly, we are not persuaded by Roy's contention that she was irreparably prejudiced by the trial court's decision to allow the animations into evidence when there were

[5] Interestingly, prior to trial, Roys attorneys filed motions *in limine,* one of which requested that counsel be allowed the use of demonstrative aids. Roy sought [t]o allow counsel the use of demonstrative aids during the trial of this cause. On the day the trial was set to begin, the parties stipulated to the use of demonstrative aids, and the stipulation was approved by the trial court.

a number of avenues she could have pursued to mitigate any alleged prejudice, and yet failed to do so at trial.

*B. Demonstrative evidence was admissible.*

■

¶ 15.   Roy next argues that the animations were improperly admitted into evidence under the guise of being demonstrative aids when, instead, the animations depicted ultimate facts at issue in the case. To support this argument, Roy cites, almost exclusively, to a case from an outside jurisdiction. However, case law from outside jurisdictions is not controlling in Wisconsin. Furthermore, the case that Roy relies on, *Spyrka v. County of Cook*, 851 N.E.2d 800 (Ill. App. Ct. 2006), is distinguishable.

¶ 16.   In *Spyrka*, a case arising out of a medical malpractice action, the plaintiff was allowed to present a video animation at trial to assist his expert in explaining to the jury the medical concepts involved. *Id.* at 805–06. On appeal, the court concluded that video animation was not a routine demonstrative exhibit designed to assist the jury's understanding, but rather, "purport[ed] to show, in a step-by-step fashion, what happened to [the patient]," thereby depicting the plaintiff's theory of causation. *Id.* at 810. In addition, the *Spyrka* court noted that the animation made no attempt to account for the conflicting expert testimony favoring the defendants, which was presented at trial. *Id.* Consequently, the court concluded that the plaintiff's expert "could not state that the animation was an accurate portrayal of what it purport[ed] to show" and that the trial court had improperly admitted it into evidence. *Id.* at 811.

¶ 17. Here, in contrast, the animations do not purport to show "in a step-by-step fashion" what happened to Roy. *See id.* at 810. Instead, Dr. Vogelzang testified that the animations were the defendants' "best approximation given the limitation of animation. It, of course, is not a look inside Mrs. Roy's body. But, yes. It's a schematic or divermatic representation of the action of this catheter sheath." In addition, an animation was also provided to depict Roy's theory; thus, the one-sided animation at issue in *Spyrka* is wholly distinguishable from the animations at issue here. *See id.*

¶ 18. We agree with Dr. Sane's contention that the video animation was "a graphic illustration of Dr. Vogelzang's previously disclosed opinions." The trial court also concluded that this was nothing more than a doctor getting up on the stand and drawing a picture to illustrate his testimony. In *Anderson v. State*, 66 Wis. 2d 233, 248, 223 N.W.2d 879 (1974), the court explained that "[d]emonstrative evidence, whether a model, a chart, a photograph, a view, or . . . a duplicate [of an item believed to have been stolen in the commission of a crime], is used simply to lend clarity and interest to oral testimony." The animations served merely to illustrate Dr. Vogelzang's opinions on both the plaintiff's and the defendants' theories as to the extent of endothelialization, and we detect no prejudice from the trial court's decision to allow the animations into evidence. *See id.* at 249.

## C. Sufficient foundation existed.

¶ 19. Roy contends that the animation was not an accurate depiction of what transpired, "but rather, [was] based on Dr. Vogelzang's speculation of what

*could* happen if a fully endothelialized stent became dislodged." (Emphasis in brief.) In addition, Roy asserts that "[t]here is no medical foundation for the video animations that purport to show what a previously deployed stent would look like and therefore the evidence should have been excluded."

¶ 20.    First, Roy misstates the law by arguing that an expert opinion cannot be expressed in terms of possibility. In fact, a defense expert is allowed to produce evidence of possibilities. *Peil v. Kohnke*, 50 Wis. 2d 168, 183, 184 N.W.2d 433 (1971). In *Peil*, the court stated:    "Although the party with the burden of proof must produce testimony based upon reasonable medical probabilities, the opposing party is not restricted to this requirement and may attempt to weaken the claim for injuries with medical proof couched in terms of possibilities." *Id.* (citations and quotations omitted).

¶ 21.    Moreover, in making this argument, Roy attempts to use this appeal as a roundabout attack on Dr. Vogelzang's credibility. By doing so, she overlooks that the admissibility of Dr. Vogelzang's testimony is not at issue on appeal; rather, the appeal centers on the admissibility of the video animations. Her time to challenge Dr. Vogelzang's testimony was at trial during cross-examination, not now. *See State v. Walstad*, 119 Wis. 2d 483, 518–19, 351 N.W.2d 469 (1984) (noting that in Wisconsin, "where substantially unlimited cross-examination is permitted, the underlying theory or principle on which admissibility is based can be attacked by cross-examination or by other types of impeachment"). Any alleged weaknesses in expert opinions go to the weight of the testimony, which is an issue for the jury to decide, not this court. *See Bloomer Hous.*

673

*Ltd. P'ship v. City of Bloomer*, 2002 WI App 252, ¶ 12, 257 Wis. 2d 883, 653 N.W.2d 309 ("The weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the fact finder.' " (citation omitted)).

*D. The animations were acceptable portrayals.*

¶ 22.  Lastly, Roy argues that the trial court erred in admitting the video animation into evidence because the animations were not a fair and accurate portrayal and their probative value was substantially outweighed by their prejudicial effect. Roy attempts to distinguish the animations in her case from the motion picture of a simulated crash utilizing dummies that was allowed into evidence in *Maskrey v. Volkswagenwerk Aktiengesellschaft*, 125 Wis. 2d 145, 370 N.W.2d 815 (Ct. App. 1985).

¶ 23.  The lawsuit in *Maskrey* arose out of an automobile collision, and the plaintiff sought to introduce a film of crash experiments as a reenactment of the plaintiff's automobile accident. *Id.* at 163. In concluding that the film was properly admitted into evidence, the *Maskrey* court noted that "[d]emonstrative simulations of crashes are to be viewed by a jury if they are similar to the original event and not so prejudicial as to destroy a party's ability to present a defense." *Id.* at 165–66.

¶ 24.  The *Maskrey* court acknowledged that while the film was not exactly the same as the circumstances of the accident, "it was sufficiently similar to give the jury a view of what occurs in this type of accident." *Id.* at 166. In addition, the court noted that the defendant in *Maskrey* was allowed extensive cross-examination of the plaintiff's witness in an effort to impeach his credibility. *Id.*

¶ 25.   Roy argues that the defendants' video animations were not demonstrative aids in that they did not fairly represent what actually occurred. However, as noted above, *Maskrey* does not require that demonstrative evidence exactly replicate the circumstances at issue. *See id.* at 166. Rather, they need only be "sufficiently similar" such that the jury can get a view of the issues involved. *See id.* Moreover, *Maskrey* supports the view that cross-examination with respect to a demonstrative aid can cure and eliminate whatever prejudice there may have been. *See id.*

¶ 26.   Roy then relies on non-controlling case law from other jurisdictions to argue that a video typically should not be admitted into evidence if "it simply portrays a scene arranged to support a contention advanced by the proffer." In *State v. Peterson,* 222 Wis. 2d 449, 588 N.W.2d 84 (Ct. App. 1998), a case arising out of a boating accident, the defendant's investigator prepared a videotape to demonstrate the conditions that were present on the night of the accident. *Id.* at 452. The videotape was made one month after the accident, on a night that was "similar, but not identical" to the night the accident occurred. *Id.* In addition, the boat depicted in the video "was similar, but not identical" to the boat that was involved in the accident at issue. *Id.* The investigator testified that the videotape reflected what he saw at the time that it was made. *Id.* at 452–53. The trial court subsequently excluded the videotape based on a lack of expert testimony to establish its accuracy. *Id.* at 453.

¶ 27.   However, the court of appeals reversed and held that to be admissible, all that is necessary is that a witness, who need not be an expert, testify "based on personal knowledge that the movie or videotape is a fair

675

and accurate representation of what is depicted." *Id.* at 456 (citation and quotations omitted). The court was persuaded by the photographer's testimony that the videotape "was 'a very good reproduction' " and it "closely resembled" what he saw when he prepared the video. *Id.* at 456–57.

¶ 28. Here, Dr. Vogelzang confirmed that the animations at issue were his best approximation of the parties' theories, based on angiogram images that were obtained following procedures performed on Roy along with her clinical outcome:

> [Dr. Sane's attorney:] At my request did you assist in creating an animation video clip that depicts your opinions with respect to the tearing effect of the fully embedded iliac stent?
>
> [Dr. Vogelzang:] Yes, I did. And we – I guided you in producing this video based on the images we see here in terms of our depiction or this depiction of the stent being displaced without disruption. So it was based on angiogram images.
>
> . . . .
>
> [Dr. Sane's attorney:] Do you have an opinion as to whether this [clip reflecting the defense theory of what occurred] would assist the jury in understanding what transpired in this case?
>
> [Dr. Vogelzang:] Yes.
>
> [Dr. Sane's attorney:] What's your opinion?
>
> [Dr. Vogelzang:] My opinion is that this would because it's based principally on the findings that we see on the angiogram and the clinical outcome of the patient.

Just as the video in *Peterson* was found to have suffi-

cient foundation, *id.* at 456, we conclude that the above-referenced testimony of Dr. Vogelzang that the animations were approximations based on angiogram images that he viewed, provided a sufficient foundation for the trial court to allow the animations into evidence.

¶ 29. The record reflects that Roy's attorney thoroughly questioned Dr. Vogelzang during cross-examination and brought the numerous shortcomings and deficiencies that Roy argues on appeal to the jury's attention in an attempt to impeach his credibility. Roy's attorney questioned Dr. Vogelzang regarding the fact that these were not actual replications of the angiogram procedures, since no one could know exactly what happened, but rather were simply demonstrations of each party's theory. Specifically, the jury was told that the animation was a schematic, and not an actual look inside of Roy's body, when Dr. Vogelzang testified as follows:

> [Roy's attorney:] This [animation] is the version of what you think happened; is that right?
>
> [Dr. Vogelzang:] It's our best approximation given the limitation of animation. It, of course, is not a look inside Mrs. Roy's body. But, yes. It's a schematic or divermatic representation of the action of this catheter sheath.

■■■■■

¶ 30. "The question of whether the prejudicial effect of evidence outweighs its probative value is well within the trial court's discretion." *Gieseke*, 145 Wis. 2d at 213 (citation and quotations omitted). The animations presented, in simple terms, the two positions of the parties, and we agree with the trial court's determination that the result was no different than if Dr. Vogelzang had hand-drawn illustrations during his

testimony to depict the parties' theories. Dr. Vogelzang was subjected to a vigorous cross-examination, during which he admitted that his testimony at trial differed from that provided during his deposition and that the animation of the defendants' theory, in turn, differed from his trial testimony. Furthermore, he admitted during cross-examination that he had never dislodged a stent, so he would not know what force would need to be exerted to do so. As a result, we reject Roy's assertion that she was in any way prejudiced by the alleged problems with the animations and conclude that the trial court did not erroneously exercise its discretion in permitting the jury to see the animations.[6]

*By the Court.*—Order affirmed.

---

[6] Dr. Sane moved to strike portions of Roy's reply brief, or, in the alternative, for permission to file a supplemental brief due to new arguments he contends were raised in Roy's reply brief. Roy argued, in response, that the issues in the reply brief either are germane to or respond directly to issues raised in either her brief-in-chief or Dr. Sane's response brief. We held Dr. Sane's motion to strike in abeyance pending our decision.

To the extent that Roy raised new arguments in her reply brief, we have no need for supplemental briefing to reject them and do not address them here. "It is a well-established rule that we do not consider arguments raised for the first time in a reply brief." *Bilda v. County of Milwaukee*, 2006 WI App 57, ¶ 20 n.7, 292 Wis. 2d 212, 713 N.W.2d 661 (citing *Northwest Wholesale Lumber, Inc. v. Anderson*, 191 Wis. 2d 278, 294 n.11, 528 N.W.2d 502 (Ct. App. 1995)).