**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**March 3, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2018AP1697**

**STATE OF WISCONSIN**

Cir. Ct. No.  2015FA404

**IN COURT OF APPEALS**
**DISTRICT III**

IN RE THE MARRIAGE OF:

RANDY LEE SMITH,

   PETITIONER-APPELLANT,

 V.

CATHERINE MARIE SMITH,

   RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for St. Croix County: SCOTT R. NEEDHAM, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Randy Smith, who is divorced from his former wife Catherine, appeals a postdivorce order clarifying the parties' financial positions and obligations pursuant to a marital settlement agreement (MSA) that had been incorporated into the divorce judgment.[1]  The MSA contemplated that the parties' home would be sold, but the sale was not completed until nearly two years after the divorce was finalized.  In the interim, and contrary to an expectation stated in the MSA, Catherine had moved out of the home.  Additionally, the parties had continued using the marital credit cards and each took an unanticipated $30,000 payment from the proceeds of the sale of the home, thereby reducing the funds available to be distributed pursuant to the MSA.

¶2     Randy argues the circuit court erred by failing to give effect to certain MSA provisions, by refusing to order that the parties be reimbursed for their minimum payments to the credit cards, by offsetting the reimbursable amount of his mortgage and home equity payments by one-half of the cost of Catherine's rent during the relevant time period, and by setting the terms of repayment for the remaining amount owed to Catherine under the MSA.  We conclude the circuit court properly exercised its discretion in these matters.  Consequently, we affirm.

## BACKGROUND

¶3     Randy and Catherine were granted a judgment of divorce on June 8, 2016.  The judgment incorporated the terms of an MSA, which resolved issues involving, among other things, the property division, including the disposition of

---

[1]  Catherine did not file a response brief.  This appeal was taken under submission with only Randy's brief-in-chief to consider.

the parties' real estate. As relevant here, the MSA recognized the parties held title to a residence in Hudson, Wisconsin, which was to be sold.

¶4 The MSA directed that the proceeds from the sale of the home were to be disbursed to pay off a numbered list of various loans and credit cards (in the amounts owed as of the date of divorce). The parties were to be reimbursed for any payments on any of those debts made between the date of the divorce and the date the house was sold. Any remaining net proceeds were to be paid to the parties, with Catherine receiving the first $150,000 and the remaining balance, if any, split equally.[2] If the proceeds from the sale were insufficient to provide Catherine with $150,000, Randy agreed to pay the difference with four percent annual interest owed on any amounts unpaid after 120 days.

¶5 The MSA contemplated that the parties would remain in the residence during the pendency of the home sale, and that they would "split[] the costs of maintaining the home, utilities, insurance, taxes, groceries, household chores, etc. as has been the practice during their marriage." Catherine, however, vacated the residence approximately one month after the divorce judgment was entered. Randy continued living in the residence and paid the mortgage, a home equity loan, and property taxes, while Catherine paid for the home insurance.

¶6 The parties' home was not sold until December 29, 2017. Up to the date of the sale, the parties had made only minimum payments on their credit card debt, and the balances on the cards equaled or exceeded the amounts owed as of

---

[2] This provision was consistent with a provision in the property division section of the MSA, which recognized that Catherine was to receive the first $150,000 from the net proceeds from the sale of the marital residence in lieu of any maintenance obligation.

the date of divorce.[3]  At the real estate closing, the credit card balances were paid in the amounts owed as of the date of the divorce.  The mortgage and the home equity loan were extinguished with the sale proceeds.  The balance remaining for distribution to the parties was $92,024.58.  Of that, the parties agreed that they would each receive $30,000, and the remaining $32,024.58 was placed in trust.

¶7      Catherine subsequently filed a "Motion to Clarify Judgment," in which she advised the circuit court that the parties had been unable to agree on how her vacating the marital home should affect the distribution of the home sale proceeds.  Catherine also stated that the proceeds from the home sale were insufficient to both pay down the parties' debt and provide for Catherine's $150,000 "maintenance buy out."[4]

¶8      The circuit court held a motion hearing, at which the parties agreed that the issue before the court was the proper interpretation of the MSA. Catherine, who had not been represented by counsel at the time the MSA was signed but was represented at the hearing, argued that because she was making far less than Randy at the time, she believed the MSA (and particularly, the language regarding the parties' cost-splitting practices during their marriage) preserved the marital status quo regarding who was paying specific home expenses.[5]  Randy's

---

[3] Catherine made payments on two of the cards, while Randy made payments on the remaining four.

[4] For purposes of this opinion, we will refer to this required $150,000 payment as an "equalization payment."

[5] Catherine represented at the hearing that, during the marriage, Randy had paid the mortgage, the home equity credit line, the majority of the credit card bills, and the utilities. Catherine paid the remaining credit card bills, the parties' various insurance expenses, and for groceries.

position, conversely, was that the MSA required them to split the identified expenses equally.

¶9      Additionally, although it was undisputed that Randy would owe Catherine money under the divorce judgment, the parties differed regarding how the remaining amount of that obligation was to be calculated and the terms of its repayment. Catherine stipulated that Randy should receive credit for $46,928.20 in mortgage and home equity loan payments he had made between the date of divorce and the date the home was sold.[6] The parties disputed, however, whether Catherine was entitled to reimbursement for her rent paid after she moved out of the parties' marital residence. They also disputed whether Randy was entitled to reimbursement for the amount of credit card payments he had made in excess of the amount of Catherine's credit card payments, whether certain of Randy's living expenses incurred after Catherine moved out were reimbursable, and the terms of repayment.

¶10     The circuit court first addressed the undisputed reimbursable items. It began by crediting Randy $46,928.20 based on his payments on the mortgage and home equity loan, and it gave Catherine a $1,231.27 credit for paying Randy's half of a medical expense incurred on behalf of the parties' son. The court denied Catherine's request for rent reimbursement, but it also found it inequitable under the circumstances to order that Randy be fully reimbursed for his mortgage and

---

[6] Although Randy provided the circuit court with a spreadsheet he had prepared listing his proposed reimbursable expenses, he did not separately identify the expenses by category in his argument. In his closing argument, he merely offered that, by his calculation, the total of *all* the reimbursable expenses was $61,880.81. The court specifically found that the amount of the reimbursable mortgage and home equity payments was $46,928.20. Randy does not challenge that finding on appeal.

home equity payments when he was the home's sole occupant.[7]  Accordingly, the court reduced the $46,928.20 in Randy's reimbursable home payments by one-half of the amount Catherine had paid as rent, or $4,950.  This reduction brought Randy's total of reimbursable items to $41,978.20.

¶11     The circuit court declined to order a number of items of reimbursement sought by the parties, based on a change in the parties' circumstances following the divorce judgment.  The court determined that neither party should be reimbursed for their credit card payments subsequent to the date of divorce, as the MSA

> clearly contemplated that the balances would be reduced with any payments made pending closing and that the intent of the [MSA] was to make each party "whole" and provide reimbursement "if" the balances were reduced by their individual payments.  Such was not the case and the amounts owing as of closing equaled the amounts owing as of [the] date of divorce.

The court also declined to order reimbursement to Randy for his living expenses incurred after Catherine moved out, as the expectations expressed in the MSA that the parties "would reside together, share expenses, and that the home would be sold in a timely manner" were not realized.

---

[7] The circuit court determined that Catherine had waited too long to make her request for rent reimbursement, observing that she had vacated the home approximately one month after the divorce was finalized and had never sought relief from the divorce judgment.  The court used similar reasoning when declining to order Randy's reimbursement for certain household expenses after Catherine moved out.

¶12 Based upon the foregoing findings, the circuit court set forth a balance sheet showing that, after taking into account the identified reimbursable items, the $30,000 each party received at closing, the trust account proceeds and interest, Randy (the petitioner) owed Catherine (the respondent) $79,198.29:

| Petitioner | | Respondent | |
|---|---|---|---|
| Mortgage / equity payments: | $41,978.20 | Equalizer payment: | $150,000.00 |
| Money rec'd at closing: | - 30,000.00 | Medical reimb: | 1,231.27 |
| | | Money rec'd at closing: | - 30,000.00 |
| Totals: | $11,978.20 | Totals: | $121,231.27 |

Reconcilliation:

| | |
|---|---|
| Total owed to Respondent: | $121,231.27 |
| Less total owed to Petitioner: | - $ 11,978.20 |
| Balance owed to Respondent: | $109,253.07 |
| Interest at 4% (5/1 – 7/20) | $ 969.80 |
| | $110,222.87 |
| Trust account proceeds pd to Respondent: | - $ 32,024.58 |
| Net amount owing to Respondent: | $ 79,198.29 |

The court ordered that amount payable in monthly installments of $800 with four percent annual interest. Randy now appeals.

## DISCUSSION

¶13 Randy first argues the MSA required that following the sale of the parties' marital residence, the debts were to be repaid in a particular order. A stipulation incorporated into a judgment is subject to the typical rules of contract construction. *Spencer v. Spencer*, 140 Wis. 2d 447, 450, 410 N.W.2d 629 (Ct. App. 1987). When the language of the agreement is plain and unambiguous—as it is in this case—we give effect to that language as written. *See Topolski v. Topolski*, 2011 WI 59, ¶¶28, 33, 335 Wis. 2d 327, 802 N.W.2d 482. The proper

interpretation to be given to the divorce judgment and the MSA is a question of law that we review independently of the circuit court. *Id.*, ¶28.

¶14 The relevant MSA provisions in this case are found in Section 3, which is entitled "Real Estate." Section 3.B. includes an enumerated list of items, preceded by the requirement that "[t]he proceeds from the sale of the residence and real estate shall be disbursed as follows." Item number one is the mortgage, item number two is the home equity loan, and items numbers three to eight are the parties' various credit cards. Item number nine states: "Reimburse each party for payments issued to any of the above (#1-8) from the date of divorce until the date the house is sold." Item number ten states that the "[r]emaining net proceeds are to be paid to the parties with the first $150,000 paid to … Catherine … and the remaining balance, if any, split equally between the parties." Then, in Section 3.C., we find the requirements that the parties both reside in the residence until its sale, "splitting the costs of maintaining the home, utilities, insurance, taxes, groceries, household chores, etc. as has been the practice during their marriage."

¶15 Randy asserts the circuit court was required to conduct its calculations in precisely the foregoing order, first allowing for reimbursements for any payments made to the mortgage, home equity loan, and credit cards before considering what amount was owed for Catherine's equalization payment and for splitting living expenses. He contends that following this process would have led to the court to conclude that his reimbursable items totaled $61,880.81 and that (after subtracting the $30,000 payment he had taken at the time of the home sale), he was still owed approximately $31,880.81, which he proposed to take from

Catherine's attorney's trust account.[8]  Randy then proposed that the excess of Catherine's $30,000 payment from the home sale proceeds (after subtracting her reimbursable expenses) should be credited toward the equalization payment he owed her, with the amount of his reimbursable living expenses further reducing the amount of that payment.

¶16    We agree with Randy that the MSA is unambiguous, but not in the manner he suggests.  Rather, the MSA calls for certain debts to be paid from the home sale proceeds, but no language in the MSA (other than perhaps the mere existence of the paragraph numbers) gives any particular debt priority over another.  The only specific language that hints at any sort of priority of payments is found in Section 3.B.(10), which states that the "[r]*emaining*" net proceeds are to be paid first to Catherine in the amount of $150,000, then split equally. (Emphasis added.)  While the parties likely would have been required to first pay off the mortgage and home equity loan as a condition of the home sale, nothing in the MSA directly required this—nor did it require the circuit court to consider the parties' living expenses last, as Randy suggests.

¶17    Even if there was a specific sequencing required by the MSA, Randy points to nothing that authorized many of the actions the parties took subsequent

---

[8] It is not clear how the sequencing, in and of itself, aids Randy, except perhaps in determining which party was entitled to immediate possession of the approximately $32,000 in Catherine's attorney's trust account.  In any event, Randy's "process" argument appears to be largely intertwined with his arguments challenging the circuit court's decision about which items were reimbursable.  We will address those arguments shortly.

As a further aside, we note that neither Randy's appellate brief nor his posthearing submission to the circuit court explain precisely how he arrived at the $61,880.81 figure.  He merely asserted that this was the amount required under the relevant provisions of the MSA, apparently expecting the court to sift through the various spreadsheets he submitted in support of his request.

to the divorce. Almost immediately, Catherine moved out of the residence, in express contravention of the provision that both parties would remain in the residence, and in apparent contravention of the MSA provision requiring that they share the residence and living expenses.[9] Despite Randy's "sequencing" argument, he points to nothing in the MSA that authorized the parties to each immediately take $30,000 from the proceeds of the home sale, as they did. And the parties added new debt to their credit cards even though significant marital balances remained, creating an issue regarding how any payments were to be allocated between the old and new debts.

¶18 The circuit court was required to untangle this snarl of new circumstances and determine how the associated financial repercussions should be fairly treated under the MSA. *See Topolski*, 335 Wis. 2d 327, ¶58 (noting that once a party's "unfortunate and unforeseen disability" occurred, the circuit court's task was to determine how payments as a result of that disability were to be treated under the relevant MSA). The issue is not so much whether the MSA is ambiguous, although some cases discuss the issue in those terms. *See Washington v. Washington*, 2000 WI 47, ¶¶20-25, 234 Wis. 2d 689, 611 N.W.2d 261 (collecting cases "demonstrat[ing] that after a final division of property, problems may arise that require the circuit court to construe a final division of property in a divorce judgment, in order to effectuate the judgment"). Rather, when new circumstances arise, a motion to clarify the effect of the divorce judgment in light of those new circumstances is appropriate. *See id.*, ¶19. The circuit court's

---

[9] Catherine testified Randy asked her to leave, but the cause of her departure is immaterial. The point here is that neither party demonstrated fidelity to the precise terms of the MSA following entry of the divorce judgment.

jurisdiction continues until the property is disposed of pursuant to the judgment, and a circuit court has the authority to do all things necessary and proper to carry out its orders and do justice. *Id.*, ¶¶14-15.

¶19 The notion of "doing justice" between the parties informs our standard of review when the circuit court must resolve difficult postdivorce issues that frequently arise. Certain aspects of a court's decision must be regarded as questions of law, which we review de novo; for example, whether the court exceeded its "clarifying" function and improperly revised or modified the final property division. *See id.*, ¶15. However, when a circuit court is presented with a situation in which new facts must be shoehorned into an existing divorce judgment, a court's equitable resolution to the situation is reviewed for an erroneous exercise of discretion. ***Jeffords v. Scott***, 2001 WI App 6, ¶7, 240 Wis. 2d 506, 624 N.W.2d 384 (2000).

¶20 Indeed, ***Jeffords*** ably demonstrates these concepts. In that case, pursuant to an MSA, the transfer of a $100,000 interest in the husband's retirement plan was contingent upon the wife's repayment of a $50,000 loan to the husband. *Id.*, ¶2. The loan was later discharged in bankruptcy, prompting the husband to file a motion for clarification requesting that he be given a setoff against the amount of the retirement plan subject to transfer for the wife's nonpayment of the loan. *Id.*, ¶3. The circuit court concluded that although technically the husband no longer had any obligation under the MSA to transfer an interest in the retirement plan (as the loan had not been repaid), it would exercise its equitable authority and order him to transfer a $50,000 interest in the retirement plan to account for the lost loan proceeds. *Id.*, ¶4. We agreed that although a "strict application of the MSA" would have relieved the husband of his obligation, *id.*, ¶13, the circuit court nonetheless "appropriately exercised its equitable powers

11

to fashion a remedy to implement the intent of the parties," *id.*, ¶15. This exercise appears to be precisely what the circuit court did here.

¶21    Having rejected Randy's arguments regarding the interpretation of the MSA, we turn to his specific challenges to the circuit court's clarifying efforts in this case. First, he contends the court erroneously "declined to give either party reimbursement for payments made on the credit cards after the date of divorce." The court provided a very good reason for declining to order such reimbursement: namely, the marital portion of the credit card balances had not changed whatsoever between the divorce and the closing on the home sale. When those balances were paid off at the closing, there had been no reduction in the amount of marital debt and the amount as of the date of divorce was paid in full.

¶22    Randy nonetheless argues the circuit court's reasoning ran afoul of the MSA provision requiring that each party be reimbursed for their payments to the parties' various debts between the date of the divorce and the date of the home sale. In Randy's view, because the parties made minimum payments on their credit cards during the relevant time period, the fact that the parties owed the same amount of debt at the home closing is irrelevant. Randy believes all of these minimum payments were reimbursable under the MSA.

¶23    Randy's analysis fails to account for the circuit court's clear finding that the parties had continued using the credit cards after the judgment of divorce. Although Randy claims he did not include "any charges he made on the credit cards since the date of divorce in his request for repayment," it appears he

12

requested reimbursement for the entirety of the minimum payments he made.[10]  If the entirety of the minimum payments had been applied to the parties' marital debt, one would expect the principal amount of that debt to have decreased over time (even if only marginally).  But because the marital balances were the same, it seems clear that some portion of the minimum payments was allocated to either interest or principal associated with new, nonmarital debts.  Importantly, Randy did not separately identify the portions of the payments that were properly allocated to marital debts; he simply presented his minimum payments as fully reimbursable.

¶24    It is true, as Randy contends, that the circuit court did not articulate this precise line of reasoning in its decision, focusing instead on the parties' apparent intent under the MSA to be "made whole" for any payments.  Still, we may search the record for reasons to sustain the circuit court's exercise of discretion.  *State v. Radder*, 2018 WI App 36, ¶24, 382 Wis. 2d 749, 915 N.W.2d

---

[10] This determination was no easy task.  The spreadsheet Randy presented to the circuit court did not break down his payments by month.  Instead, the spreadsheet includes only a single line item aggregating approximately twenty months of payments (for example, on the Amazon Chase Visa, the single line item was for $5,177).  Randy did not explain at the hearing how he arrived at this number; he merely introduced into evidence a thumb drive that he claimed included "all [his] receipts and invoices" for the amounts identified on his spreadsheet.

On our own initiative—and despite the rule that we have no duty to scour the record to review arguments unaccompanied by adequate record citations, *see Roy v. St. Lukes Med. Ctr.*, 2007 WI App 218, ¶10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256—we hunted through the files on the thumb drive and reviewed a portion of the credit card statements apparently supporting Randy's request.  We found that the minimum payments called for on a particular card roughly added up to the aggregate amount Randy identified on his spread sheet for reimbursement (there was apparently a statement issued for January 2018 that was not present on the drive).  In any event, to the extent Randy would wish to take issue with our record sleuthing, we note we would otherwise have refused to even consider his argument based on his failure to cite to the specific records that supported his request.  *See Lechner v. Scharrer*, 145 Wis. 2d 667, 676, 429 N.W.2d 491 (Ct. App. 1988).

180. We will affirm a discretionary decision if the circuit court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *Franke v. Franke*, 2004 WI 8, ¶54, 268 Wis. 2d 360, 674 N.W.2d 832. The court correctly identified the key fact that the amounts of marital debt on the credit cards were unchanged at the home closing.[11] Because we can discern a reasonable basis for the court's refusal to order reimbursement of the parties' credit card payments during the relevant time period, we affirm on that issue.

¶25 Randy also argues the circuit court erred by offsetting his reimbursable mortgage and home equity payments by a portion of Catherine's rent. He does not challenge the equity of the court ordering an offset.[12] Rather, he argues that the court was required to follow the MSA, which directed the parties to reside together and split living expenses and did not make any provision for rent reimbursement. By ordering the offset, Randy argues the court ranged well beyond its "clarifying" function and impermissibly rewrote the MSA.

---

[11] Randy argues the MSA contemplated the credit cards would be used after the date of divorce, because the agreement effectively froze the amounts of marital debt on the respective cards at that time. Even if that were true, the MSA made reimbursable only the payments the parties made toward their marital debt. We know this because Section 3.B.(9) states the closing proceeds could be used to "[r]eimburse each party for payments issued to any of the above (#1-8) from the date of divorce until the date the house is sold," and item numbers three through eight identify each credit card and the amount of marital debt associated with it. The argument that the parties were entitled to reimbursement for payments made on new postdivorce debt is a nonstarter.

[12] Indeed, we would easily reject any such argument. The circuit court found it inequitable that Catherine would subsidize Randy's housing costs when the MSA's expectation was that the parties would continue to live together. Accordingly, it ordered that the amount of Randy's mortgage and home equity payments be offset by $4,950, which was one-half of the amount of Catherine's rent during the relevant time period.

¶26 We reject Randy's attempt to characterize the circuit court as having "modif[ied] the parties' written agreement so that the terms would be more equitable in light of the changed financial circumstances of the parties." Randy compares this case to ***Rosplock v. Rosplock***, 217 Wis. 2d 22, 577 N.W.2d 32 (Ct. App. 1998), wherein the MSA dictated that only the wife's Schedule C income should be considered in deciding whether the husband's maintenance obligation should be reduced. ***Id.*** at 25-26. The circuit court in that case nonetheless concluded the stipulation was imprudent or deficient because it did not include all of the wife's income. ***Id.*** at 28-31. We held that the court erred because it ignored the clear language of the agreement. ***Id.*** at 30-31.

¶27 Unlike in ***Rosplock***, here it was the parties, not the circuit court, that ignored the MSA. The court was merely asked to determine how the parties' failures to abide by the agreement (and other, related matters on which the MSA was silent) should be treated. The court's determinations regarding the treatment of certain items as reimbursable was a proper "clarifying" function and not merely an attempt to rewrite the parties' agreement on their behalf. Furthermore, and as the court noted, neither Randy nor Catherine sought to have the court address the material changes in circumstances that occurred between the judgment of divorce and the home sale until after the sale occurred. In short, the court possessed the authority to identify whether specific items should be treated as reimbursable given the new facts, and it properly exercised its discretion when doing so.

¶28 Finally, Randy challenges the circuit court's determinations regarding the terms for repayment of the amount he owes to Catherine. He argues

that the determination he can pay $800 per month is an "abuse of discretion."[13] His argument in this regard is largely undeveloped; he simply suggests the financial disclosure statement he submitted to the circuit court shows he "does not have the ability to make large payments each month." Although Randy's brief sets forth some of his expenses, he does nothing to demonstrate an inability to pay $800 per month.

¶29 Randy suggests a more appropriate amount would be $552 per month, but we cannot reconcile this sum with the financial disclosure statement he submitted to the circuit court. That document purports to show his monthly pretax income at $6,250 against monthly expenses of $9,564. If that financial disclosure statement is to be believed (and the circuit court clearly did not believe it), Randy would be underwater each month to the tune of about $4,800 after taxes. We note that Randy's financial statement suggests he makes approximately $75,000 before taxes, whereas Catherine testified that during the marriage Randy's income "varied" but was around $120,000 annually.[14] The court could also reasonably view Randy as overstating the amount of his monthly expenses; his financial disclosure spreadsheet includes, for example, an approximately $2,000 line item for "incidentals." Under the circumstances, we conclude the court did not erroneously exercise its discretion when setting the terms of repayment.

---

[13] Our supreme court abandoned the phrase "abuse of discretion" in 1992 in favor of the phrase "erroneous exercise of discretion." *See City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 171 Wis. 2d 400, 423, 491 N.W.2d 484 (1992).

[14] Again, Randy does not provide specific record citations to any documents that might support this claimed amount of his monthly earnings.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.