THOMAS J. GLUSASKAS, Individually and as Executor of ROSE GLUSASKAS, Deceased, Appellant, v JOHN E. HUTCHINSON, III, M.D., P. C., et al., Respondents, et al., Defendant.

First Department, July 13, 1989

### APPEARANCES OF COUNSEL

*Jeffrey A. Lichtman* of counsel *(Stuart A. Schlesinger* and *William D. Fireman* with him on the brief; *Julien & Schlesinger, P. C.,* attorneys), for appellant.

*Peter C. Kopff* of counsel *(Martin B. Adams* with him on the brief; *Kopff, Nardelli & Dopf,* attorneys), for respondents.

### OPINION OF THE COURT

MILONAS, J.

The issue before us herein is the propriety of the admission into evidence of a videotape prepared exclusively for trial by defendant physician of a surgery performed by him on another patient.

This is an action to recover damages for wrongful death allegedly caused by the negligence and medical malpractice of defendants. The deceased, Rose Glusaskas, then a 46-year-old woman with a history of rheumatic heart disease, was originally referred to defendant Dr. John E. Hutchinson in late 1974. It was determined that she was suffering from aortic stenosis and severe mitral stenosis, and, on January 28, 1975, he performed an aortic and mitral valve replacement on her at St. Luke's Hospital. Mrs. Glusaskas made follow-up visits to Dr. Hutchinson until March of 1977. She next saw him in St. Luke's Hospital in November of 1981, by which time she had had several strokes and had also developed subacute bacterial endocarditis, abnormal heart rhythm and poor left ventricular function. Her general condition having continued to deteriorate, Dr. Hutchinson concluded that without surgery her prognosis was extremely poor. Consequently, on November 13, 1981, Mrs. Glusaskas was taken into the operating room and placed under general anesthesia. The surgery began at 8:00 A.M. An incision was made in the old operation site, and the sternal wires were removed. The sternum was cut with an oscillating saw. Marked hemorrhage was noted. When the edges of the sternum were opened and retracted, a small tear in the ascending aorta became stretched, resulting in uncontrollable hemorrhaging. The patient died on the operating table.

An autopsy subsequently determined that the cause of death was "laceration of aorta sustained during surgical repair of infected prosthetic mitral valve. Internal hemhorrage." Plaintiff's expert witness expressed the view that the laceration of the aorta by defendant was a departure from accepted

medical practice and that it was also a violation of standard practice for him to have spread the sternum, thereby enlarging the hole. Moreover, there was considerable testimony by witnesses for both sides concerning the surgical technique employed, and the finding of liability against Dr. Hutchinson which had been made by the medical malpractice screening panel was also offered into evidence. During the direct examination of defendant, his counsel attempted to introduce a videotape of another heart valve replacement operation performed by Dr. Hutchinson six years after the fatal surgery on decedent and only 2 to 3 weeks before the start of the trial herein. The reason for the film was ostensibly to acquaint the jury with the applicable surgical procedures. The court, over plaintiff's strong objection and after observing the film in camera and conducting a voir dire examination on its admissibility, permitted use of the tape by defendant, ruling that it was sufficiently relevant to show the jury how the procedure is done and that the tape was not prejudicial. In addition to the videotape, defendant also relied upon a model of the heart for purportedly illustrative purposes.

The jury verdict was in favor of defendants against plaintiff, both individually and as executor of the estate of his late wife. On appeal, the sole issue in dispute is the allowance into evidence of the tape and the defendant's testimony that accompanied it. In that connection, it should be stated that the film was prepared exclusively for the trial of the instant action some 2 or 3 weeks prior thereto and more time was spent on the videotaped surgery than is the normal practice. The patient involved in the demonstration operation was a male in his late forties or early fifties whose physical condition differed in a number of significant respects from that of Rose Glusaskas, including the fact that he was a much larger and apparently healthier individual, that his ventricular valve rather than his aorta adhered to the sternum and that his heart was not nearly so enlarged as the deceased's had been. Plaintiff contends that the trial court's decision to permit the jury to view the videotape was highly improper, inflammatory and prejudicial. We agree.

While Dr. Hutchinson's avowed aim in making the videotape was to have it serve as an educational aid with respect to human anatomical features and surgical methods, it is evident that the actual effect of exhibiting the film, if not defendant's unexpressed intention, was to endeavor to persuade the jury that because he had carefully and successfully operated on

another heart patient, he had applied the same degree of care in Rose Glusaskas' surgery. However, as explained in Richardson, Evidence § 186, at 155 (Prince 10th ed): "The general rule in New York is that evidence of a person's habitual conduct under similar circumstances in respect to using care is inadmissible for the purpose of raising an inference that he exercised the same amount of caution on the occasion when the injury in question was sustained. Such evidence is excluded for the reason that it raises too many collateral issues and, also, because it borders too closely on character evidence, which is not admissible in civil cases."

In *Halloran v Virginia Chems.* (41 NY2d 386) the Court of Appeals, in a personal injury products liability action, acknowledged that "[a]t least, as in this kind of case, where the issue involves proof of a deliberate and repetitive practice, a party should be able, by introducing evidence of such habit or regular usage, to allow the inference of its persistence, and hence negligence on a particular occasion" (at 392). Yet, nothing contained in *Halloran v Virginia Chems. (supra)* can be construed to undermine the basic validity of the proposition that "[w]hen negligence is at issue, however, New York courts have long resisted allowing evidence of specific acts of carelessness or carefulness to create an inference that such conduct was repeated when like circumstances were again presented" (at 391). Indeed, the holding in *Halloran v Virginia Chems. (supra)* relaxes the traditional rule only to the extent of accepting that in certain instances, such as products liability litigation, proof of regular usage or habit might be warranted where deliberate and repetitive practice is involved. The instant allegation of medical malpractice certainly does not present a situation comparable to that of a purportedly defective packaged refrigerant, the subject of the dispute in *Halloran v Virginia Chems. (supra).* The manufacture or use of an inanimate object is scarcely analogous to that of a physician performing surgery wherein each patient and the nature of his or her medical condition is unique as are the actions of the operating doctor.

It is crucial that evidence of a person's specific acts of carelessness or carefulness on other occasions is generally inadmissible even when the underlying circumstances of the prior or subsequent conduct was similar to the one in contention. Here, the circumstances of the surgery performed in Glusaskas and that depicted in the videotape were not alike. Not only was the tape prepared exclusively for the trial, thus

providing Dr. Hutchinson with an opportunity to use special, if not extraordinary, care in the filmed operation (and defendant admits that more time was taken on the demonstrated procedure than is normally done), but the medical and physical condition of the two individuals involved was, as heretofore noted, different. Further, if the purpose of the videotape was to show the jury how a valve replacement surgery is performed, the patient on the tape was being operated on to establish coronary bypass grafts and not to have his valves replaced. If, on the other hand, the intent was to demonstrate how a sternum is cut, it is significant that, in an action in which plaintiff claims that defendant had sliced through the deceased's sternum too quickly and carelessly, it was highly prejudicial to enable the jury to view the tape of a procedure in which the surgeon was proceeding much more slowly and deliberately. In fact, defendant's own expert witness testified that the surgery portrayed on the film was "overdone" and made "with the knowledge that a movie camera was over the shoulder of the doctor."

The manner in which the videotape was presented was, indeed, devastating. In viewing the film in camera, the court apparently did not anticipate that it would be played in conjunction with, and enhanced by, the defendant's commentary, and, therefore, the court did not in any way attempt to avoid prejudicing the jury by delineating the scope and nature of Dr. Hutchinson's testimony. Similarly, the trial court could not appreciate the dramatic impact that this testimonial package would have on the jury. As the film was being observed by the jury, Dr. Hutchinson was permitted to describe how carefully he had operated on the patient therein. Thus, he explained, in reference to the oscillating saw that was supposedly the same type also used on Rose Glusaskas, "it's held, as you can see, and it's triggered by a little trigger device here (indicating), and one *meticulously* goes through the layers of the sternum" (emphasis added). Defendant's counsel then requested that his client show how the sternum was sliced, and Dr. Hutchinson stated that "this is what we are doing. We are going through. * * * We are on the outer layer. Now we are taking out the blade. This blade reaches only so far down. We then have to go to a deeper blade", asserting, in response to a question, that he had gone this far with Glusaskas. He thereafter testified to having "switched to the deeper blade, as you can see here, to get through the posterior layer, so the blades are being switched," but the

aorta was not yet visible as "[y]ou can see the aorta is way up here, and so there is no way that one could see the aorta," and, then, "as you can see from our hands there, this is a *delicately* controlled thing that is done simply by feel. You can't see it, but you can feel it. You can feel it when the bone gives. You can see the saw go through it. * * * I suppose it's a combination of hearing and seeing and feeling. *It's just something that you do with experience*" (emphasis added).

The implication is clear that Dr. Hutchinson, the meticulous and experienced doctor that he is, having just demonstrated to the jury the enormous care which he generally takes in operating on his patients, was not apt to have been negligent in Glusaskas' case. He also, insidiously, tried to impress the jury with the greater degree of difficulty involved in performing surgery on the subject patient since he "has much more tissue over. Mrs. Glusaskas was simply skin and bone. She did not have this interposed fat. She was a much bonier person. * * * In this patient you've got a great deal of tissue, we had to dig them out a little more. In skinny patients this is a lot easier." In the operation on the male patient, who was considerably heavier than the deceased and, thus, had more tissue which needed to be cut through, it would, according to Dr. Hutchinson, normally take more time to reach the sternum than was the situation with Glusaskas. Comparing the two surgical procedures and, indeed, referring to some 500 estimated reoperations, defendant could only recall one lacerated aorta, that of the deceased herein.

Moreover, not content with making a production of his general conscientiousness, Dr. Hutchinson, in reply to an inquiry regarding whether it is "possible to lift up the sterum and see what is under there before you cut?", declared, "No, not up here. That's impossible, this is someone holding a cloth to keep the blood from splashing in our faces. We are all afraid of AIDS these days." Shortly after this probably not coincidental reference to AIDS and, as if the jury had not yet been sufficiently inflamed, defendant's attorney dropped the punchline, "Was there any way in this case for you to avoid lacerating the aorta of Rose Glusaskas and still perform the surgery?" Dr. Hutchinson, of course, answered, "In my opinion, there was not." Therefore, under the guise of exhibiting the videotape for instructional purposes, defendant instead utilized it to show how painstaking and prudent he normally performs during his surgical procedures. It is apparent that preparing the videotape specifically for the trial only weeks before that trial was scheduled to commence and playing it to

the jury immediately prior to a disclaimer by Dr. Hutchinson of any medical malpractice, not neglecting to inject a mention of AIDS at the appropriate time, all seem to add up to an episode deliberately staged by defendant and his counsel in order to prejudice the jury in his favor. Regrettably, the trial court allowed the performance to proceed.

Although the use of an instructional film in a malpractice action might be justified under certain circumstances as where, for instance, an expert witness is demonstrating how a particular medical procedure is commonly carried out, such a film is surely inappropriate as a self-serving device prepared by a defendant specifically for introduction at a trial in order to disprove his negligence in an entirely separate surgery. Certainly, the videotape in question herein did not constitute relevant or probative evidence of anything, whether of the techniques usually employed in cutting into the sternum or of the care normally exercised by Dr. Hutchinson. Therefore, even if an individual's prior or subsequent conduct were admissible as proof that he used the same care when the injury was suffered, which it is not, here the record clearly indicates that Dr. Hutchinson was especially cautious and meticulous during the filmed surgery. Considering the limited usefulness of the videotape as an instructional tool and its total absence of evidentiary value regarding the operation actually performed on the deceased, it was improper for the court to authorize its admission, particularly in view of the high potential for prejudice inherent in exhibiting such a film to the jury. Accordingly, plaintiff is entitled to have the judgment vacated and a new trial ordered.

Consequently, the judgment of the Supreme Court, New York County (Helen E. Freedman, J.), entered on February 2, 1988, which, following a jury verdict, found in favor of defendants John E. Hutchinson, III, M.D. and John E. Hutchinson, III, M.D., P. C. and awarded defendants costs and disbursements, should be reversed on the law, the judgment vacated and the matter remanded for a new trial, with costs and disbursements.

MURPHY, P. J., KASSAL, WALLACH and RUBIN, JJ., concur.

Judgment, Supreme Court, New York County, entered on February 2, 1988, unanimously reversed, on the law, the judgment vacated and the matter remanded for a new trial. Appellant shall recover of respondents $250 costs and disbursements of this appeal.